469 A.2d 470
**Ja-Wan McGEE**

v.

**CRIMINAL INJURIES COMPENSATION BOARD.**

**No. 319, Sept. Term, 1983.**

Court of Special Appeals of Maryland.

Jan. 10, 1984.
As Corrected Jan. 24, 1984.

John Amato, IV, Baltimore, with whom were John T. Enoch and Goodman, Meagher & Enoch, Baltimore, on brief, for appellant.

Valerie V. Cloutier, Asst. Atty. Gen., with whom was Stephen H. Sachs, Atty. Gen. of Maryland on brief, for appellee.

Argued before LOWE, LISS and BISHOP, JJ.

LOWE, Judge.

"[C]onceding an inability to ameliorate to any degree the threat of violent crime, and undertaking to assume the consequences of such crime as a public burden, on the ground of 'moral responsibility'", the General Assembly enacted Md.Ann.Code, Art. 26A, the Criminal Injuries Compensation Act. *Criminal Inj. Comp. Bd. v. Gould,* 273 Md. 486, 498, 331 A.2d 55 (1975). That sense of moral responsibility has not so infected the sovereign conscience, however, that government will assume the more pointed consequences of its own negligent acts that cause equally serious financial hardships. See, *e.g., City of Baltimore v. Austin,* 40 Md. App. 557, 572, 392 A.2d 1140 (1978), *aff'd Austin v. City of Baltimore,* 286 Md. 51, 405 A.2d 255 (1979). For that pur-

pose seventeen-year-old paraplegic Ja-Wan McGee sought succor from the Criminal Injuries Compensation Board for the "serious financial hardship" imposed upon him when Baltimore City Police Officer Stephen McCown apparently misapprehended McGee's conduct and shot at him three times until he finally felled him with a bullet severing McGee's spinal column.

As in tort law where a claimant must prove causation and injury, eligibility for a criminal injury award also has two prongs of inquiry; the first to ascertain that the claimant was the victim of a crime for which he was in no way responsible, (§ 5) and secondly, that he will suffer "serious financial hardship" (§ 12). Procedurally the statute provides that when a claim is accepted for filing, it "shall" be assigned by the chairman to himself or to another member of the three member board who shall examine the papers and investigate the validity of the claim, regardless of whether the alleged criminal has been apprehended or prosecuted. If he is unable to decide the claim by examination and investigation he may hold a hearing. Upon reaching his decision he shall file a written report setting forth reasons for either granting an award or denying the claim. Art. 26A, § 8.

Within 30 days of his receipt of the report, the claimant may make application "for consideration of the decision by the full Board", or the Board may do so upon its own motion. The statute mandates—and presumably limits— this full Board consideration to a "review [of] the record" and restricts the Board either to "affirm or modify the decision of the [single] Board member to whom the claim was assigned." § 9.[1] Finality of the decision (presumably

---

1. "(a) The claimant may, within thirty days after receipt of the report of the Board member to whom his claim was assigned, make an application in writing to the Board for consideration of the decision by the full Board.

(b) Upon receipt of an application pursuant to subsection (a) of this section or upon its own motion, the Board shall review the

for purposes of notification and possible administrative appeal) is determined as being when the Board affirms or modifies the decision, or when thirty days after the single member decision is received by the claimant has elapsed by his having filed no application or no action is taken by the Board on its own motion. At this time "the secretary of the Board shall promptly notify the claimant, the Secretary of Public Safety and Correctional Services, the Attorney General and the Comptroller of the final decision of the Board and furnish each with a copy of the report setting forth the decision." *Id.*

Prior to 1975, the statute provided no right of appeal to a denied claimant but did permit "the Attorney General ... [to] commence a proceeding in the circuit court ... to review the decision of the Board," at which additional evidence could be taken. No other judicial review was permitted according to § 10 of the statute, and the Court of Appeals held on January 16, 1975 in *Criminal Inj. Comp. Bd. v. Gould, supra,* that this also excluded application of the appeal provisions of the Administrative Procedure Act. Two months later the Legislature responded by enacting § 10(c) which now provides appellate relief pursuant to the Administrative Procedure Act, Md.Ann.Code, Art. 41, §§ 255 and 256.

After Ja-Wan McGee's claim was accepted, examined and investigated, an eligibility hearing was scheduled to obtain further evidence and insight for deliberation of the primary

---

record and affirm or modify the decision of the Board member to whom the claim was assigned. The action of the Board in affirming or modifying such decision shall be final. If the Board receives no application pursuant to subsection (a) of this section or takes no action upon its own motion the decision of the Board member to whom the claim was assigned shall become the final decision of the Board.

(c) The secretary of the Board shall promptly notify the claimant, the Secretary of Public Safety and Correctional Services, the Attorney General and the Comptroller of the final decision of the Board and furnish each with a copy of the report setting forth the decision." Art. 26A, § 9.

concern of whether a crime had been committed and it was stipulated and agreed that that issue was the only issue to be determined at that hearing.

Joseph Pickus, Chairman of the Board, presided at the hearing which was also attended by Board member Meyer. Apparently, the Attorney General's office was invited to participate, according to Chairman Pickus' subsequent opinion, "to protect the interest of the parties and to assure that all issues would be heard in a fair and impartial manner". The Assistant Attorney General, however, assumed the role of claimant's antagonist from the start by attempting to thwart McGee's effort to establish that Officer McCown's shooting of him was a crime. His efforts on behalf of the State were clearly adversarial rather than impartial. Since the statute does not contemplate an appearance of the Attorney General until the decision of the Board or Board member becomes final, we are not surprised that his role was obscure, even to him.

Nonetheless, the hearing was had and Chairman Pickus wrote a thorough and articulate report setting forth *his* decision that McGee was a "victim of a crime" whose injuries were compensable and set forth in scholarly detail his reasons therefor. So concluding, the decision (dated August 19, 1981) ordered further hearings to determine the nature and extent of the claimant's disability.

On September 2, 1981, Chairman Pickus died. On September 3, 1981, the Attorney General—whose posture in the case at that juncture was questionable at best—requested a full Board review. When apprised that only the claimant, or the Board itself, had that right, the two surviving Board members, acting on the Board's "own motion", ordered on September 30, 1981, through acting chairman Marshall M. Meyer and Commissioner Jeffrey R. Schmieler, that the previous proceedings be transcribed, that the record be reviewed

"and that a further hearing be held in this case by the Full Board, at which time the claimant and the Assistant

Attorney General shall present any additional relevant evidence in support of their respective positions . . . . "

By the time the hearing was had on March 3, 1982, a new Chairman, Russell C. Milburn, presided and explained how Commissioner Schmieler and Meyer had decided on "their own initiative to initiate under Section 9(b) of Article 26A a full Board hearing."[2]  He further explained that

"all statements, investigative reports, notes and prior testimony are part of the record and received into evidence and will be considered by the Board in rendering of its final decision of this Full Board hearing so that we also ask you that at the end of the case or sometime later we will be reviewing the extensive transcript that was written before in addition to everything else that has been submitted."

He then asked that the claimant and the Assistant Attorney General submit any additional evidence that "would be of any assistance in reaching a final decision."

The Board itself had ordered subpoenaed Officer McCown whom the Assistant Attorney General considered "in standing really a party in this case", but who had declined the opportunity to appear before Chairman Pickus.  The Assistant Attorney General whom Chairman Pickus had called in "to protect the interest of the parties and to assure that all issues would be heard in a fair and impartial manner", again assumed an adversarial posture more pointedly this time of defending Officer McCown, "a man here whose career has been finished . . . . "  In addition to Officer McCown's testimony, the Assistant Attorney General produced two fellow officers for the purpose of testifying that under the circumstances prior to the shooting, Officer McCown had probable cause to believe a robbery was in progress.  He also produced over objection the report of Officer McCown's psychia-

---

2. The subsequent majority opinion of Chairman Milburn and Commissioner Meyer, however, recites that the full Board hearing was held "at the request of the Department of Public Safety and Correctional Services."

trist in order to show the psychiatric stability of the officer who, during his ten year tenure, had never before fired his gun.

This evidence became relevant because the question to be decided—whether a crime had been committed—was narrowed factually to whether Officer McCown had committed the common law crime of assault when he shot McGee. The peripheral issues were disposed of by undisputed findings that McGee and Robinson were at the scene legally and no evidence of any misconduct or breach of peace was introduced, and that Officer McCown did not have the mens rea or specific criminal intent usually associated with criminal conduct. Since McCown has repeatedly admitted having pointedly shot at McGee with the intent and purpose of rendering him into submission (which he did), the crime of assault would have been committed unless the shooting was justified or excusable, despite the fact that McCown was not prosecuted theretofore.[3]

There was evidence in both hearings intended to generate the defense of self-defense and/or reasonable necessity.[4] In the former hearing before Chairman Pickus, McCown's testimony before the Baltimore City Police Trial Board was introduced which corresponded to his live testimony before the full Board. In neither instance are the "facts" in dispute. They revealed that as Officer McCown returned from a night school class, he stopped at the pizza shop to pick up a pizza order called in by his wife. The shop was in a high crime area and he observed the furtively suspicious

---

**3.** Art. 26A, § 8(c) provides that:

"Claims shall be investigated and determined, regardless of whether the alleged criminal has been apprehended or prosecuted for or convicted of any crime based upon the same incident, or has been acquitted, or found not guilty of the crime in question owing to criminal responsibility or other legal exemption."

**4.** "It is not assault, if a person uses force in order to restrain another from doing mischief to himself or a third person, or to restrain him from some act of manifest wrong, as, *e.g.*, where a church warden takes a hat from a man's head in church." *Hochheimer's Criminal Law,* § 258 (2d ed. 1904).

conduct of McGee and Robinson peering in the shop window from a darkened area. When he entered he was apprehensive that a robbery might ensue, so he removed his pistol from its holster and held it in the pocket of his trench coat. When the boys entered, Robinson first approached the counter at a rapid walk and as McGee entered the store, he reached into the waistband of his trousers, removing a silver and dark object between his thumb and fingers. Within "split-seconds", the officer fired through his coat pocket three shots at McGee, thinking that a crime was in progress and fearful for his own life, as well as those of others. The third shot severed McGee's spinal column.

Relying in part on live testimony of others present, especially a waitress who did not feel threatened by McGee or Robinson, Chairman Pickus found from all the evidence that a crime had been committed by McCown which caused McGee's injuries and that the circumstances did not justify or excuse the assault by shooting. Substantially the same result was later reached by Commissioner Schmieler who dissented from the two-man majority of the full Board's finding to the contrary that no crime was committed by the officer because he was justified in reacting as he did in defending himself in view of the reasonable apprehension of danger. In deciding whether Officer McCown's fear for his life was a reasonable one, the Board pointedly ignored the lack of apprehension testified to by the waitress and expressly relied upon by Chairman Pickus.

Our review of the entire record indicates to us that at both hearings either result might have been sufficiently supported by competent, material and substantial evidence so that a reasoning mind might have reached either factual conclusion—depending upon who was believed by the finder-of-fact. As a consequence neither decision would have been arbitrary or capricious from an evidentiary sufficiency standard, Md.Ann.Code, Art. 41, § 255, if the "review" by the Board was anticipated by the Legislature as permitting the Board to substitute its judgment for the factual determina-

tions made by the single member who had heard the case initially.

The procedural problems are not so easily disposed of, however, since the legislative language in permitting a full Board review is peculiarly restrictive. There is no right expressed upon such review, for instance, for a de novo hearing or for taking and considering evidence not first heard by the single member. The statute very clearly provides only a right to "review the record" without the slightest implication that such review carries with it a right to hear additional evidence or to substitute its factual conclusions for those of the single Board member who originally investigated the case and may have heard the witnesses. Art. 26A, § 9. The absence of § 9 of a right to hear or rehear evidence—as contrasted with reviewing it in the record—is pointed up in § 10 by the fact that upon judicial review through a proceeding commenced by the Attorney General in the circuit court, that court *is* expressly given the right to "take additional testimony, if it so desires." In light of that express authority, the silence in the preceding section which limits the full Board to a "review [of] the record" clarifies the limitation upon the authority of the Board to a record review as expressed. *Expressio unius est exclusio alterius.*

It is further underscored by a noticeable and interesting absence of the full Board authority of an expressed right to "reverse" the single Board member. The statute provides a right of the Board to "affirm or modify the decision of the Board member to whom the claim was assigned", and even repeats that the action of the Board "in affirming or modifying" such decision shall be final, but nowhere is the right to reverse expressed. We will assume that just as "the requirement for an approval implies the power to disapprove", the right to affirm implies the right to reverse. *Balto. County v. Egerton Realty,* 217 Md. 234, 239, 140 A.2d 510 (1958). The significance of the absence of the expressed right, however, we glean as a legislative precaution carefully avoiding the suggestion that the Board upon review might

simply second-guess the hearing member, who could judge credibility vel non in the flesh, so to speak, and not merely from a cold record "review".

It is implicit—if not explicit—in that section, however, that the single Board member's decision will become final (for purposes of full Board review as well as subsequent appeal), if the Board receives no application for review from the claimant, or if the Board takes no action on its own motion. The single Board member's decision was dated August 19, 1981, and countersigned by the Secretary who was charged "thereupon [to] notify the claimant and furnish him a copy of such report, upon request." The time claimant has within which he may apply for a full Board hearing is 30 days from the *receipt* of that report. The clear implication of the statute is that if the Board elects to review it, it too must act within 30 days.

"If the Board receives no application pursuant to subsection (a) of this section or takes no action upon its own motion the decision of the Board member to whom the claim was assigned shall become the final decision of the Board."

Surely finality may not be left in abeyance ad infinitum at the whim of the Board. Clearly the Legislature intended finality to fall on the close of the 30th day, otherwise appeal rights of the single member decision could be obliterated merely by non-action and the appeal period for the Attorney General contained in § 10 would neither begin to run nor even arise.

Seemingly this problem occurred to someone on the Board when it signed the order initiating the full Board review. Chairman Pickus' decision was dated August 19, 1981, and the order initiating review was originally dated the 30th of September following, however, someone appears to have written over the *30* th attempting to make it *20*. In fact, this superimposing appears to have occurred after the commencement of the review itself, because new Chairman Milburn referred to the order as of September *30*. But we need not decide that mercurially elusive date.

It is arguable, of course, that in this case only the stipulated issue of eligibility was decided and the 30 day period of full Board review did not apply until after the decision on the nature and extent of damages had been rendered. This is presumably the view taken by the Attorney General since he did not exercise his sole statutory right to "commence a proceeding in the circuit court", § 10(a).[5] Even if that is so, however, the full Board had no right to retry de novo the eligibility issue to which all participants had stipulated be bifurcated from the compensation issue. Assuming then, that the 30 days had not run, the Board could only have assigned the compensation issue to another Board member (since Chairman Pickus had died) and exercise its right of review following an award. Art. 26A, § 8(a) makes it clear that a "claim, when accepted for filing, *shall* be assigned by the chairman to himself or to another member of the Board." (Emphasis added). The Court of Appeals with increasing consistency has held that when the Legislature says "shall", it means "shall". *Pope v. Secretary of Personnel,* 46 Md.App. 716, 717–718, 420 A.2d 1017 (1980).

Because the authority of the Board to review beyond the 30 day period on its own motion was not raised on appeal, although objected to below, we will assume the issue was waived. It was, however, a jurisdictional issue in that it goes to the authority of the Board to act; ordinarily we would raise such issues on our own motion. Here, however, the record extract does not show when the claimant "received" the report,[6] which began the 30 day clock running,

---

**5.** Considering the zealousness with which the Attorney General fought the claimant, protected the officer, "represented" the Secretary of Public Safety and Correctional Services and vigorously defends the two-man majority of the Criminal Injuries Compensation Board on the appeal, it is hard to believe that the Attorney General did not overlook his § 10(a) right after he had improperly sought a full Board review, but recognized that the right did not ripen until an "award" was made which in his "judgment" was "improper."

**6.** The transmittal letter was dated August 25, 1981. Empirically considering the "reliability" of the mails, however, we dare not

§ 9(a), at least as to him, nor is the date clearly discernible. Our reversal is predicated upon the Board's sua sponte action which was premature since the degree of financial hardship, *i.e.,* damages had not been determined and no "award" was made. The case was, therefore, not ripe for review in light of the eligibility determination favoring the claimant.[7]

We will, therefore, reverse the Circuit Court for Baltimore City and remand the case to it. The Circuit Court should in turn reverse the denial of the award by Criminal Injuries Compensation Board and remand the case to it directing that Chairman Pickus' decision upon eligibility be reinstated and that a Board member be assigned to determine an award, if entitled, pursuant to Art. 26A, § 12. See *Gould, supra* 273 Md. at 514, 331 A.2d 55. The receipt of that half of the decision together with the eligibility decision of Chairman Pickus already received is that which constitutes an "award" from which the claimant shall have 30 days to apply for full Board review of the entire record and the full Board shall have the same time to promulgate such review on its own motion.

■ We should make clear that although the full Board review appears precisely to be that—a *review* of the record made by the single member assigned—the Board is restricted from drawing permissible inferences available upon those same facts that may be contrary to inferences drawn by the single member. Although the Board is not bound merely to "modify or affirm" a record in which the evidence is obviously insufficient, it may not second-guess the hearing member on witness credibility and it must consider all of the

---

judicially notice that the letter has been received even yet. See *Hoffman Chevrolet, Inc. v. Washington County National Savings Bank,* 297 Md. 691, 467 A.2d 758 (1983).

**7.** If it were ripe, however, we would hold that the full Board review was initiated beyond the 30 day period allowed.

evidence considered by the single hearing member. If, however, the Board finds that available and important evidence has not been heard or investigated, the statute does not preclude the reviewing Board from remanding to the single member to obtain and hear or admit further evidence and even to reconsider his previous determination in the light of the new evidence. But in the absence of amendment to the statute softening the mandatory "shall" in § 8 and broadening the term "review" in § 9, it may not "hear" evidence on review not heard initially by the single Board member. Furthermore, if the single member record contains sufficient evidence to support factual determinations and is legally correct, the Board may not "reverse" his judgment. It must either "modify or affirm" unless the evidence is sufficiently persuasive to overcome a prima facie presumption of correctness.

We would add an observation to the Board that the statute does not indicate that the proceedings before it were contemplated as adversarial in nature. If the Attorney General is invited to assist the Board prior to the statutory notification in § 10 (which authorizes him to commence an action when he believes an award is improper, see *Gould, supra* at 497, 331 A.2d 55), he should do so as Chairman Pickus requested, "impartially" and not take up the cudgel of any one interested witness, proceed to create continued impediments to a claimant's burden of proving his case and generally serve as the adversarial antagonist of the claimant, who properly or improperly is seeking that which the Legislature has called the State's "moral responsibility". If the Legislature had intended the Attorney General to assume an adversarial role, it would have said so.

JUDGMENT REVERSED. CASE REMANDED TO THE CIRCUIT COURT FOR CONFORMANCE WITH THIS OPINION. COSTS TO BE PAID BY APPELLEE.